## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

AMBER SHAYA,

      Plaintiff,

v.

SIGNIFY HEALTH, LLC and
CENSEO HEALTH, LLC,
Delaware Limited Liability Companies,

      Defendants.

Case   No.   2:21-cv-12719-PDB-KGA

Hon. Paul D. Borman

Removed from Oakland County
Circuit Court
Case No. 2021-190781-CK

_____

**GASIOREK, MORGAN, GRECO,**
**McCAULEY & KOTZIAN, P.C.**
By:  Ray Carey (P 33266)
*Attorneys for Plaintiff*
30500 Northwestern Highway, Suite 425
Farmington Hills, MI 48334
(T) 248-865-0001 (F) 248-865-0002
Rcarey@gmgmklaw.com

**DICKINSON WRIGHT PLLC**
Kathryn S. Wood (P55017)
Maureen J. Moody (P85032)
*Attorneys for Defendants*
500 Woodward Avenue, Ste.4000
Detroit, MI 48226
313-223-3691
kwood@dickinsonwright.com

_____

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Amber Shaya ("Plaintiff" or "Ms. Shaya"), by and through her

attorneys, GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN, P.C., for her

Amended Complaint against Defendants, Signify Health, LLC, a foreign limited

liability company, and Censeo Health, LLC, a foreign limited liability company

("Defendants"), states as follows:

1. This is an action by Plaintiff Amber Shaya against Defendants for unequal pay, retaliation, and interference in violation of the Equal Pay Act of 1963, 29 U.S.C. §§ 201, et seq., *see* 29 U.S.C. § 206, 29 U.S.C. §215(a)(3); for discrimination against Plaintiff on account of her sex, interference with and deprivation of Plaintiff's right to be free from discrimination on account of her sex, and retaliation against Plaintiff because of her opposition to Defendants acts of discrimination against Plaintiff on account of sex in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L.A. §§37.2101, *et seq*.; and breach of contract and unjust enrichment in violation of Michigan common law. Plaintiff's claims arise out of the circumstances leading up to and including the wrongful termination of Plaintiff's employment with Defendants, effective September 9, 2021, and Defendants discriminatory and retaliatory conduct toward and breach of obligations to Plaintiff since then.

## PARTIES

2. Ms. Shaya is an individual who currently resides at 204 Charing Cross Court, Bloomfield Hills, Michigan 48304, and was employed by Defendants in Bloomfield Hills, Michigan, between October 29, 2018, and September 9, 2021, when her employment was wrongfully terminated.

3. Defendant Signify Health, LLC ("Signify") is a Delaware limited liability company which at all times relevant had offices in Michigan, was

qualified to conduct and conducted business in Michigan, employed individuals in Michigan, and had as its resident agent The Corporation Company, 40600 Ann Arbor Road E., Ste. 201, Plymouth, MI 48170.

4.      Defendant Censeo Health, LLC ("Censeo") is a Delaware limited liability company which at all times relevant had offices in Michigan, conducted business in Michigan, and employed individuals in Michigan.

5.       Defendants jointly employed Ms. Shaya in Michigan during the period between October 29, 2018, and September 9, 2021, when her employment was wrongfully terminated.

## JURISDICTION AND VENUE

6.      The amount in controversy exceeds $75,000 exclusive of interest and costs.

7.      This Court has subject matter jurisdiction over Plaintiff's claims under and pursuant to 28 USC § 1331 (federal question jurisdiction), 28 U.S.C. § 1332 (diversity jurisdiction), 28 U.S.C. §§ 1337, 1343 (civil rights), and 29 USC §216(b) (equal pay).

8.      This Court has personal jurisdiction over Defendants because they engage in regular and systematic business and other activities within the Eastern District of Michigan, Defendants' resident agent is located within the Eastern District of Michigan, and the acts attributed to Defendants that give rise

to Plaintiff's claims occurred and adversely affected her within the Eastern District of Michigan.

9.     This Court has personal jurisdiction over Defendants because the office where Plaintiff performed the duties and responsibilities of her various positions with Defendants at all times relevant was in Bloomfield Hills, Michigan.

10.    Venue is proper in this district court pursuant 28 U.S.C. §1391(a), (b), and (c) because Plaintiff resides within the Eastern District of Michigan; Defendants maintain offices, engage in regular and systematic business and other activities, and their resident agent is located within the Eastern District of Michigan; and the events that give rise to Plaintiff's claims occurred or had consequences on Plaintiff within the Eastern District of Michigan.

11.    Venue also is convenient in this judicial district.

## **COMMON FACTUAL ALLEGATIONS**

12.    Ms. Shaya is a former Vice President for U.S. Medical Management and Vice President of Operations, Midwest for Aspire Health, Inc ("Aspire").

13.    Ms. Shaya was actively recruited by Defendants to terminate her then current employment with Aspire and to accept employment with Defendants during the three to six-month period preceding September 28, 2018.

4

14.    During the three to six-month period preceding September 28, 2018, Ms. Shaya and representatives of Defendants negotiated over the terms, conditions, and benefits of employment with Defendants that would be adequate consideration for her to terminate her then current employment with Aspire and to accept employment with Defendants.

15.    On September 28, 2018, Ms. Shaya was offered and accepted a position with Defendants as their VP, Product Management-Network Services for Signify's Clinical Network Services line of business ("Biopharma"), effective October 29, 2018.

16.    As specified in an agreement, dated September 28, 2019 ("the Agreement"), which was negotiated by parties and confirmed by the signatures of Defendants' Director of Corporate Recruiting and Ms. Shaya on September 28, 2018, the VP, Product Management-Network Services position accepted by Ms. Shaya was to have been a "permanent" position and her employment could only have been involuntarily terminated for cause, which meant "due to reduction in force, downsizing, change in company direction, control or job elimination." A copy of the agreement ("Employment Agreement") is attached to this complaint as **Exhibit 1**.

17.    The Agreement provided, among other terms, conditions, and benefits of Ms. Shaya's employment with Defendants, that she would receive an

annual base salary, a [s]igning bonus, and 2500 Class B Common Units of equity in Defendants; she was eligible for annual bonus or incentive compensation, health, dental, disability, retirement and other benefits; and:

> "[i]n the event of an involuntary termination due to reduction in force, downsizing, change in company direction, control or job elimination you will be paid a severance in an amount equal to 9 months of your base salary. Severance is contingent upon execution of a Separation Release and Agreement."

18.    As Defendants' VP, Product Management-Network Services and later as its VP, Operations, Ms. Shaya was employed by Defendants in accordance with the terms of an express or implied employment agreement which provided and she legitimately expected that she would be treated the same as other vice presidents, peers, and other employees of Defendants with respect to annual base salary, bonus or other incentive compensation, and equity awards consideration, opportunities and consideration for promotion, consideration for alternative employment opportunities, and other terms and conditions of employment.

19.    As Defendants' VP, Product Management-Network Services and later as its VP, Operations, Ms. Shaya was employed by Defendants in accordance with the terms of an express or implied employment agreement which provided and she legitimately expected that she would be treated the same as other vice presidents, peers, and other employees of Defendants with

respect to alternative employment opportunities in the event her "permanent" job position was eliminated with or without cause.

20.    Ms. Shaya was employed as Defendants' VP, Product Management-Network Services and later as its VP, Operations, and had her office in Bloomfield Hills, Michigan, and initially reported to Ms. Lisa DiSalvo ("Ms. DiSalvo"), Senior Vice President of Strategic Product Development ("Strategic Product Development"), who was located in Colorado.

21.    As Defendants' VP, Product Management-Network Services and later as its VP, Operations, Ms. Shaya was responsible for providing expertise and direction to Signify's Product, Technology, Operations, and "Go-to-Market" organizations with respect to Signify's Biopharma business; partnered with Signify clinical operations, technology, and biopharma teams in the design, development, implementation, and success of Signify's Biopharma clinical and support services product offerings; was the key leader with respect to development, launch, and management of Signify's Biopharma clinical and support services product offerings, including development of a network of clinicians in Michigan and elsewhere to deliver biopharma related services; was responsible for pricing and positioning of Signify's biopharma services and working in tandem with Signify's marketing, finance, clinical, legal, and operations partners to accelerate product expansion; and partnered with

7

Signify higher leadership, executives and stakeholders concerning corporate strategy with respect to biopharma services and evaluation and analysis of the efficacy and value of Signify's biopharma services.

22. During the period between at least October 29, 2018, and September 9, 2021, Defendants perpetuated a pervasive work environment that was hostile to women because of their sex in which men were favored over women with respect to annual base salary, bonus or other incentive compensation, equity awards, opportunities and consideration for promotion, consideration for alternative employment opportunities, and other terms and conditions of employment.

23. Based on information communicated to Ms. Shaya by some of Defendants' finance, human resources and other representatives, during the period between October 29, 2018, and September 9, 2021, and thereafter by former employees of Defendants, individuals employed by Defendants as vice presidents or in lesser positions and who performed no more than equal, comparable or less work than Ms. Shaya and individuals in lesser positions who performed less work than Ms. Shaya received annual base salary, bonus or other incentive compensation, and equity awards that substantially exceeded what Ms. Shaya received.

24.     During the period between October 29, 2018, and September 9, 2021, Ms. Shaya was the victim of Defendants' unequal pay practices and she was undercompensated because of her sex.

25.     Despite the discrimination and other adversity she experienced on account of her sex during the period between October 29, 2018, and September 9, 2021, Ms. Shaya performed her duties and responsibilities in a superior and certainly more than effective manner and earned merit increases and bonuses and routinely received praise from Defendants' Chief Executive Officer, Chief Product Officer, Chief Operating Officer, and several other representatives of Defendants for outstanding performance throughout this period of her employment with Defendants.

26.     Ms. Shaya received no notice of job performance deficiencies or warnings of any kind about her job performance, and she was not subjected to discipline of any kind, a negative performance evaluation of any kind, or a correction action or performance improvement plan of any kind at any time before September 9, 2021.

27.     On or about April 17, 2020, Defendants terminated Ms. DiSalvo's employment.

28.     The annual base salary, bonus or other incentive compensation, and equity awards applicable to Ms. DiSalvo's former Senior Vice President of

Strategic Product Development position substantially exceeded what Ms. Shaya received as Defendants' VP, Product Management-Network Services.

29.    Ms. Shaya was qualified for Ms. DiSalvo's former Senior Vice President of Strategic Product Development position.

30.    After Ms. DiSalvo's employment was terminated, Ms. Shaya continued to perform her duties in a superior and certainly more than effective manner, she assumed most of Ms. DiSalvo's former duties and responsibilities, and then began reporting to Defendants' Chief Product Officer.

31.    In August, 2020, Defendants terminated the employment of their VP, Biopharma Development.

32.    After the termination of employment of the VP, Biopharma Development, Ms. Shaya continued to perform her duties and Ms. DiSalvo's former duties and responsibilities in a superior and certainly more than effective manner, she assumed the former VP, Biopharma Development's former duties and responsibilities, her job title was changed to VP, Operations, and she began to report to Defendants' Chief Operating Officer.

33.    Ms. Shaya performed Ms. DiSalvo's former duties and responsibilities and/or those of the former VP, Biopharma Development in addition to her own for more than a year in a superior and certainly more than effective manner but without a significant increase in her annual base salary,

bonus or other incentive compensation, and equity awards to adequately compensate for her increased responsibilities while other employees, especially men, who had assumed additional duties and responsibilities received significant increases in their annual base salary, bonus or other incentive compensation, and equity awards to compensate for their increased responsibilities.

34.     During the period between April 17 and September 9, 2021, Ms. Shaya regularly questioned Defendants' Chief Product Officer and its Chief Operating Officer about why she had not been considered or selected for and promoted to Ms. DiSalvo's former Senior Vice President of Strategic Product Development position and to otherwise lead the Biopharma business and advocated that she be selected for and promoted to the position because she was qualified for and had been performing the duties and responsibilities of the position and those of the former VP, Biopharma Development in addition to her own without any increase in her annual base salary, bonus or other incentive compensation, and equity awards, but they declined to honor her request because she is a woman, stating "[s]he was too nice" for the role.

35.     Although Ms. Shaya did not expressly accuse Defendants of unequal pay violations or discrimination against her based on sex when she questioned Defendants' Chief Product Officer and its Chief Operating Officer about why she

had not been selected for and promoted to the Senior Vice President of Strategic Product Development position to lead the Biopharma business and advocated that she be selected for and promoted to the position, they understood and reasonably should have understood from the context that Ms. Shaya was complaining about unequal pay and unlawful discrimination against her on account of sex with respect to their refusal to promote her and her compensation.

36.    During the period between April 17 and September 9, 2021, Ms. Shaya regularly questioned Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives about why she had not received any increase in her annual base salary, bonus or other incentive compensation, and equity awards while she performed Ms. DiSalvo's former duties and responsibilities and/or those of the former VP, Biopharma Development in addition to her own and advocated that she receive such increases, but they ignored and otherwise refused to take appropriate remedial action in response to her concerns.

37.    Although Ms. Shaya did not expressly accuse Defendants of unequal pay violations or discrimination against her based on sex when she questioned Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives about why she had not received any

increase in her annual base salary, bonus or other incentive compensation, and equity awards while she performed Ms. DiSalvo's former duties and responsibilities and/or those of the former VP Biopharma Development in addition to her own and advocated that receive such increases, they understood and reasonably should have understood from the context that Ms. Shaya was complaining about unequal pay or unlawful discrimination against her on account of sex with respect to her compensation.

38.    Ms. Shaya received telephone call and an email from Defendants' Chief Product Officer in the earlier months of 2021 giving notice that Defendants were confidentially using a third-party staffing agency, Oxeon Partners, to identify a candidate to fill Ms. DiSalvo's former Senior Vice President of Strategic Product Development position and to otherwise lead the Biopharma business.

39.    Ms. Shaya reacted to the email by thereafter continuing to question Defendants' Chief Product Officer and its Chief Operating Officer about why she had not been selected for and promoted to Ms. DiSalvo's former Senior Vice President of Strategic Product Development position and to otherwise lead the Biopharma business and to advocate that she be selected for and promoted to the position because she was qualified for and had been performing the duties and responsibilities of the position and those of the former VP Biopharma

13

Development in addition to her own without any increase in her annual base salary, bonus or other incentive compensation, and equity awards, but they declined to honor her request because she is a woman.

40.     Although Ms. Shaya did not expressly accuse Defendants of unequal pay violations or discrimination against her based on sex when she questioned Defendants' Chief Product Officer and its Chief Operating Officer about why she had not been selected for a and promoted to the Senior Vice President of Strategic Product Development position to lead the Biopharma business and advocated that she be selected for and promoted to the position, they understood and reasonably should have understood from the context that Ms. Shaya was complaining about unequal pay and unlawful discrimination against her on account of sex with respect to their refusal to promote her and her compensation.

41.     Ms. Shaya reacted to the email by thereafter continuing to question Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives about why she had not received any increase in her annual base salary, bonus or other incentive compensation, and equity awards while she performed Ms. DiSalvo's former duties and responsibilities and/or those of the former VP, Biopharma Development in addition to her own and to advocate that she receive such increases, but they

14

ignored and otherwise refused to take appropriate remedial action in response to her concerns.

42.     Although Ms. Shaya did not expressly accuse Defendants of unequal pay violations or discrimination against her based on sex when she questioned Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives about why she had not received any increase in her annual base salary, bonus or other incentive compensation, and equity awards while she performed Ms. DiSalvo's former duties and responsibilities and/or those of the former VP Biopharma Development in addition to her own and advocated that receive such increases, they understood and reasonably should have understood from the context that Ms. Shaya was complaining about unequal pay or unlawful discrimination against her on account of sex with respect to her compensation.

43.     Defendants' refusal to consider Ms. Shaya for the Senior Vice President of Strategic Product Development position because "[s]he was too nice" was a pretext for discrimination by Defendants against her on account of her sex and their preference that a man be hired for the position.

44.     Indeed, when Defendants finally hired a man to fill the VP Biopharma Development, they determined that he should not have a reporting relationship to Ms. Shaya because of her sex.

45.    Moreover, although Defendants refused to consider Ms. Shaya for the Senior Vice President of Strategic Product Development position, they required her to interview two (2) male candidates for the position and to maintain confidentiality of the search and interview process for the position.

46.    One of the male candidates was initially offered the Senior Vice President of Strategic Product Development position ("Male Candidate #1).

47.    The Senior Vice President of Strategic Product Development position was later offered to the other male candidate ("Male Candidate #2), but it was discovered that he was subject to non-compete agreement that barred his employment by Defendants.

48.    Although the requirement that Ms. Shaya participate in the interview process for Ms. DiSalvo's former Senior Vice President of Strategic Product Development position and/or leadership of the Biopharma business that was denied to her because of her sex was very demeaning, Ms. Shaya continued to perform Ms. DiSalvo's former duties and responsibilities in addition to her own and those of the former VP, Biopharma Development in addition to her own until the position was filled in a superior and certainly more than effective manner without any increase in her annual base salary, bonus or other incentive compensation, and equity awards.

49.     Ms. Shaya received no notice of job performance deficiencies or warnings of any kind about her job performance, and she was not subjected to discipline of any kind, a negative performance evaluation of any kind, or a correction action or performance improvement plan of any kind at any time before September 9, 2021.

50.     On the evening of September 8, 2021, Ms. Shaya was notified that Defendant's had terminated her employment, effective September 9, 2021, ostensibly because her job had been eliminated.

51.     Defendants refused to provide Ms. Shaya with alternative employment opportunities when her position allegedly was eliminated to prevent the full amount of her 2500 Class B Common Units of equity from vesting although men whose positions were eliminated were offered alternative employment opportunities.

52.     Defendants also initially and deceptively offered three and a half (3 ½) months of severance pay to Ms. Shaya in consideration for her execution of a full and final release of claims against Defendants although under Ms. Shaya's Agreement with Defendants she was entitled to a minimum of nine (9) months of severance pay equal to at least One Hundred Eighty-Seven Thousand Five Hundred Forty-Two and 42/100 ($187,542.42).

53.    Defendants have wrongfully refused since September 9, 2021, to tender the severance pay owned to Ms. Shaya under the terms of the Agreement because she would not agree to terms and conditions of a proposed severance agreement and full and final release that were unacceptable to her, that were not indicative of mutuality, and that were not included in or anticipated by the Agreement.

54.    Defendants' representatives post hac purported reasons for their decisions pertaining to Ms. Shaya's compensation and other benefits, other terms and conditions of her employment, refusal to promote her,  termination of her employment,   refusal to provide her with alternative employment opportunities when her position allegedly was eliminated, the deceptive offer of severance, and the refusal to tender the severance pay due under the Agreement  and their failure to investigate, respond to, and otherwise take effective remedial or corrective action in response to Ms. Shaya opposition to unequal pay and discrimination against her on account of sex with respect to the promotion and her compensation are not true and are pre-texts for discrimination against her on account of her sex.

55.    Defendants' representatives post hac purported reasons for their decisions pertaining to Ms. Shaya's compensation and other benefits, other terms and conditions of her employment, refusal to promote her, termination

of her employment,  refusal to provide her with alternative employment opportunities when her position allegedly was eliminated, the deceptive offer of severance, and the refusal to tender the severance pay due under the Agreement and their failure to investigate, respond to, and otherwise take effective remedial or corrective action in response to Ms. Shaya opposition to unequal pay and discrimination against her on account of sex with respect to the promotion and her compensation are not true and are pre-texts for retaliation against her for her opposition to unequal pay, discrimination against her on account of sex with respect to the promotion and her compensation, and the pervasive discriminatory, abusive, male dominated work culture and environment that was hostile to Ms. Shaya and other women because of their sex.

56.   On November 23, 2021, Defendants filed an action entitled, *Signify Health, LLC, v. Amber Shaya*, Civil Action No. 3:21-cv-02945-B in the United States District Court, Northern District of Texas, Dallas Division ("the Complaint").

57.   The Complaint purports to include claims against Ms. Shaya for breach of contract, misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1831, et seq., and Texas statutes, unjust enrichment, conversion, breach of the duty of loyalty, and breach of fiduciary

duty arising out of Ms. Shaya's possession of alleged trade secrets of Defendants to which she had access before Defendants wrongfully terminated her employment.

58.     However, Defendants actually filed the Complaint to further retaliate against Ms. Shaya because: (a) of her opposition to unequal pay, discrimination against her on account of sex with respect to the promotion and her compensation, and the pervasive discriminatory, abusive, male dominated work culture and environment that was hostile to Ms. Shaya and other women because of their sex; (b) she would not agree to terms and conditions of a proposed severance agreement and release that were unacceptable to her, that were not indicative of mutuality, and that were not included in or anticipated by the Agreement; and (c) she exercised her right to file this action against Defendants.

59.     Indeed, the Complaint was filed although Ms. Shaya volunteered not to use or disclose, to return to Defendants, and/or destroy any alleged trade secrets of Defendants in her possession.

60.     Defendants have not alleged and have no basis to allege in the Complaint that Ms. Shaya has used any alleged trade secret for any purpose or disclosed any alleged trade secret to any third party which are elements of

pleading and proof requisite to liability and damages under these theories of liability asserted in the Complaint.

61.    As such, Defendants have not stated "plausible" claims in the Complaint upon which relief may be granted against Ms. Shaya for breach of contract, misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1831, et seq., and Texas statutes, unjust enrichment, conversion, breach of the duty of loyalty, and breach of fiduciary duty arising out of Ms. Shaya's possession of alleged trade secrets of Defendants to which she had access before Defendant wrongfully terminated her employment. *See GE Betz v. Moffitt-Johnson,* 885 F.e3d 318 (5th Cir. 2018).

62.    Moreover, the Texas District Court lacks subject matter jurisdiction over the Texas statutory and common law claims because of Defendants' failure to state a plausible claim for violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1831, et seq., and the amount in controversy with respect to all of Defendants' claims does not exceed $75,000 exclusive of interest and costs requisite to diversity jurisdiction. *See* 28 U.S.C. § 1332.

## COUNT I
## VIOLATION OF THE EQUAL PAY ACT OF 1963

63.     Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter re-iterated paragraph by paragraph.

64.     At all times relevant, each Defendant was an "employer" of and "employ[ed]") Plaintiff as these terms are defined by section 203(d) and (g) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (d) and (g).

65.     At all times relevant, each Defendant was an "enterprise" as this term is defined by section 203(r) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (r).

66.     At all times relevant, Plaintiff was an "employee" of Defendants as this term is defined by section 203(e) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (e).

67.     At all times relevant, Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives were each a "person" as this term is defined by section 203(a) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (a).

68.     The Equal Pay Act of 1963 ("EPA), 29 U.S.C. §206(d), is an amendment to the Fair Labor Standards Act and prohibits "employer[s] ... [from] discriminat[ing] ... on the basis of sex by paying wages to employees [...]

at a rate less than the rate [paid] to employees of the opposite sex [...] for equal work on jobs [requiring] equal skill, effort, and responsibility, and which are performed under similar working conditions[.]"

69.     The work performed by Plaintiff while she was employed as Defendants' VP, Product Management-Network Services and later as its VP, Operations, was at least equal to the work performed by male vice presidents, her male peers, and males in lesser positions who received higher compensation from Defendants than Plaintiff although her contributions to Defendants greatly exceeded theirs.

70.     Plaintiff's job as Defendants' VP, Product Management-Network Services and later as its VP, Operations, required skill, effort, and responsibility at least equal to the jobs of male vice presidents, her male peers, and males in lesser positions who received higher compensation from Defendants than Plaintiff although her contributions to Defendants greatly exceeded theirs.

71.     Plaintiff's job as Defendants' VP, Product Management-Network Services and later as its VP, Operations, was performed under working conditions at least similar to, but actually more difficult than, those pertaining to male vice presidents, her male peers, and males in lesser positions who received higher compensation from Defendants than Plaintiff although her contributions to Defendants greatly exceeded theirs.

72.     Defendants' representatives violated Plaintiff's rights under the EPA by:

A. Refusing to consider Plaintiff and only considering men for a vacant Senior Vice President of Strategic Product Development position for which she was more than qualified and the duties and responsibilities of which she had been performing in addition to her own without additional base annual salary, bonus or incentive compensation, and equity awards for more than a year;

B. Failing to provide Plaintiff with base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work;

C. Failing to provide Plaintiff with additional base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work after she assumed and performed the duties and responsibilities of the vacant Senior Vice President of Strategic Product Development position and those of the former VP Biopharma Development in addition to her own;

D. Failing to provide Plaintiff with base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what male vice presidents, her male peers, and males in lesser positions who received higher compensation from Defendants than Plaintiff received and are continuing to receive;

E. Terminating Plaintiff's employment because of her sex and opposition to Defendants' unequal and discriminatory pay practices and to avoid paying her base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work;

F. Refusing to provide Plaintiff with alternative employment opportunities when her position allegedly was eliminated to prevent the full amount of her 2500 Class B Common Units of equity from vesting although men whose positions were eliminated were offered alternative employment opportunities; and

G. Otherwise discriminating against and disparately treating Plaintiff on the basis of her sex with respect to compensation

and other terms, conditions and privileges of her former Signify employment.

73.    As a direct and proximate result of Defendants' intentional violation of Plaintiff's civil rights as set forth in the EPA, Plaintiff has and will continue to suffer damages, including but not limited to: the loss of employment; the loss of salary, bonus and incentive compensation, fringe benefits, stock or Unit awards and options, both past and future; humiliation, mortification, embarrassment, and shock; mental, emotional and physical pain, suffering, and distress; and damage to her personal and professional reputation.

## COUNT II
## RETALIATION IN VIOLATION OF THE EQUAL PAY ACT OF 1963

74.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter re-iterated paragraph by paragraph.

75.    At all times relevant, each Defendant was an "employer" of and "employ[ed]" Plaintiff as these terms are defined by section 203(d) and (g) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (d) and (g).

76.     At all times relevant, each Defendant was an "enterprise" as this term is defined by section 203(r) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (r).

77.     At all times relevant, Plaintiff was an "employee" of Defendants as this term is defined by section 203(e) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (e).

78.     At all times relevant, Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives were each a "person" as this term is defined by section 203(a) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (a).

79.     The Equal Pay Act of 1963 ("EPA), 29 U.S.C. §206(d), is an amendment to the Fair Labor Standards Act and prohibits "employer[s] ... [from] discriminat[ing] ... on the basis of sex by paying wages to employees [...] at a rate less than the rate [paid] to employees of the opposite sex [...] for equal work on jobs [requiring] equal skill, effort, and responsibility, and which are performed under similar working conditions[.]"

80.     The work performed by Plaintiff while she was employed as Defendants' VP, Product Management-Network Services and later as its VP, Operations, was at least equal to the work performed by male vice presidents, her male peers, and males in lesser positions who received higher

compensation from Defendants than Plaintiff although her contributions to Defendants greatly exceeded theirs.

81.    Plaintiff's job as Defendants' VP, Product Management-Network Services and later as its VP, Operations, required skill, effort, and responsibility at least equal to the jobs of male vice presidents, her male peers, and males in lesser positions who received higher compensation from Defendants than Plaintiff although her contributions to Defendants greatly exceeded theirs.

82.    Plaintiff's job as Defendants' VP, Product Management-Network Services and later as its VP, Operations, was performed under working conditions at least similar to, but actually more difficult than, those pertaining to male vice presidents, her male peers, and males in lesser positions who received higher compensation from Defendants than Plaintiff although her contributions to Defendants greatly exceeded theirs.

83.    At all times relevant herein, under the EPA Plaintiff had a right to employment with Defendants free from retaliation, discrimination or interference because she has opposed violations of the EPA and from coercion, intimidation, threats, retaliation, discrimination, and/or interference on account of having aided or encouraged any other person in the exercise of any right granted or protected by the EPA. *See* 29 U.S.C. § 215 (a) (3).

84.     Plaintiff engaged in activity protected by the EPA when she questioned Defendants' Chief Product Officer and its Chief Operating Officer about why she had not been selected for and promoted to the Senior Vice President of Strategic Product Development position to lead the Biopharma business and advocated that she be selected for and promoted to the position because she was qualified for and had been performing the duties and responsibilities of the position and those of the former VP, Biopharma Development in addition to her own without any increase in her annual base salary, bonus or other incentive compensation, and equity awards.

85.     Although Plaintiff did not expressly accuse Defendants of unequal pay violations or discrimination against her based on sex when she questioned Defendants' Chief Product Officer and its Chief Operating Officer about why she had not been selected for and promoted to the Senior Vice President of Strategic Product Development position to lead the Biopharma business and advocated that she be selected for and promoted to the position, they understood and reasonably should have understood from the context that Plaintiff was complaining about unequal pay and unlawful discrimination against her on account of sex with respect to their refusal to promote her and her compensation.

86.    Plaintiff engaged in activity protected by the EPA when she questioned Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives about why she had not received any increase in her annual base salary, bonus or other incentive compensation, and equity awards while she performed Ms. DiSalvo's former duties and responsibilities and/or those of the former VP, Biopharma Development in addition to her own and advocated that she receive such increases.

87.    Although Plaintiff did not expressly accuse Defendants of unequal pay violations or discrimination against her based on sex when she questioned Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives about why she had not received any increase in her annual base salary, bonus or other incentive compensation, and equity awards while she performed Ms. DiSalvo's former duties and responsibilities and/or those of the former VP Biopharma Development in addition to her own and advocated that she receive such increases, they understood and reasonably should have understood from the context that Ms. Shaya was complaining about unequal pay and unlawful discrimination against her on account of sex with respect to her compensation.

88. Defendants' representatives retaliated against Plaintiff and interfered with her rights in violation of the EPA because of Plaintiff's opposition to their unequal and discriminatory pay practices when they:

A. Refused to consider Plaintiff and only considered men for a vacant Senior Vice President of Strategic Product Development position for which she was more than qualified and the duties and responsibilities of which she had been performing in addition to her own without additional base annual salary, bonus or incentive compensation, and equity awards for more than a year;

B. Failed to provide Plaintiff with base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work;

C. Failed to provide Plaintiff with additional base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work after she assumed and performed the duties and responsibilities of the vacant Senior Vice President of Strategic Product Development position and those of the former VP Biopharma Development in addition to her own;

D. Failed to provide Plaintiff with base annual salary, bonus or incentive

31

compensation, and equity awards comparable or equivalent to what male vice presidents, her male peers, and males in lesser positions who received higher compensation from Defendants than Plaintiff received and are continuing to receive;

E. Terminated Plaintiff's employment because of her sex and to avoid paying her base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work;

F. Refused to provide Plaintiff with alternative employment opportunities when her position allegedly was eliminated to prevent the full amount of her 2500 Class B Common Units of equity from vesting although men whose positions were eliminated were offered alternative employment opportunities; and

G. Otherwise discriminated against and disparately treated Plaintiff on the basis of her sex with respect to compensation and other terms, conditions and privileges of her former Signify employment.

89.    As a direct and proximate result of Defendants' intentional violation of Plaintiff's civil rights as set forth in the EPA, Plaintiff has and will continue to suffer damages, including but not limited to: the loss of employment; the loss of salary, bonus and incentive compensation, fringe

benefits, stock or Unit awards and options, both past and future; humiliation, mortification, embarrassment, and shock; mental, emotional and physical pain, suffering, and distress; and damage to her personal and professional reputation.

**COUNT III**
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**SEX DISCRIMINATION**

90.     Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter re-iterated paragraph by paragraph.

91.     At all times relevant, each Defendant was an "employer" of Plaintiff as this term is defined by section 201(a) of the Michigan Elliott-Larsen Civil Rights Act, MCL §§37.2101, et seq. ("ELCRA"). *See* MCL §37.2201(a).

92.     At all times relevant, Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives were each a "person" were each a "person" as this term is defined by section 103(g) of the Michigan Elliott-Larsen Civil Rights Act, MCL §§37.2101, et seq. ("ELCRA"), *see* MCL §37.2103(g), and each was an agent of Defendants with respect to terms and conditions of and the termination of Plaintiff's former employment with Defendants.

93.     At all times relevant herein, under the ELCRA, Plaintiff had a right to employment with Defendants free from discrimination against her based on her sex.

94.     Defendants discriminated against Plaintiff on account of her sex in violation of Plaintiff's rights under the ELCRA by:

A. Refusing to consider Plaintiff and only considering men for a vacant Senior Vice President of Strategic Product Development position for which she was more than qualified and the duties and responsibilities of which she had been performing in addition to her own without additional base annual salary, bonus or incentive compensation, and equity awards for more than a year;

B. Failing to provide Plaintiff with base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work;

C. Failing to provide Plaintiff with additional base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work after she assumed and performed the duties and responsibilities of the vacant Senior Vice President of Strategic Product Development position and those of the former VP Biopharma Development in addition to her

own;

D. Failing to provide Plaintiff with base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what male vice presidents, her male peers, and males in lesser positions who received higher compensation from Defendants than Plaintiff received and are continuing to receive;

E. Terminating Plaintiff's employment because of her sex and opposition to Defendants' unequal pay practices and discriminatory promotion practices and to avoid paying her base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work;

F. Refusing to provide Plaintiff with alternative employment opportunities when her position allegedly was eliminated to prevent the full amount of her 2500 Class B Common Units of equity from vesting although men whose positions were eliminated were offered alternative employment opportunities; and

G. Otherwise discriminating against and disparately treating Plaintiff on the basis of her sex with respect to compensation and other terms, conditions and privileges of her former Signify employment.

95.    As a direct and proximate result of Defendants' intentional violation of Plaintiff's civil rights as set forth in the ELCRA, Plaintiff has and will continue to suffer damages, including but not limited to: the loss of employment; the loss of salary, bonus and incentive compensation, fringe benefits, stock or Unit awards and options, both past and future; humiliation, mortification, embarrassment, and shock; mental, emotional and physical pain, suffering, and distress; and damage to her personal and professional reputation.

**COUNT IV**
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**RETALIATION/INTERFERENCE**

96.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter re-iterated paragraph by paragraph.

97.    At all times relevant, each Defendant was an "employer" of Plaintiff as this term is defined by section 201(a) of the Michigan Elliott-Larsen Civil Rights Act, MCL §§37.2101, et seq. ("ELCRA"). *See* MCL §37.2201(a).

98.    At all times relevant, Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives were each a "person" were each a "person" as this term is defined by section 103(g)

of the Michigan Elliott-Larsen Civil Rights Act, MCL §§37.2101, et seq. ("ELCRA"), *see*

99.     At all times relevant herein, under the ELCRA, Plaintiff had a right to employment with Defendants free from retaliation, discrimination or interference because she opposed violations of the ELCRA and from coercion, intimidation, threats, retaliation, discrimination, and/or interference on account of having aided or encouraged any other person in the exercise of any right granted or protected by the ELCRA. *See* MCL §37. 2701.

100.   Plaintiff engaged in activity protected by the ELCRA when she questioned Defendants' Chief Product Officer and its Chief Operating Officer about why she had not been selected for and promoted to the Senior Vice President of Strategic Product Development position to lead the Biopharma business and advocated that she be selected for and promoted to the position because she was qualified for and had been performing the duties and responsibilities of the position and those of the former VP, Biopharma Development in addition to her own without any increase in her annual base salary, bonus or other incentive compensation, and equity awards.

101.   Although Ms. Shaya did not expressly accuse Defendants of unequal pay violations or discrimination against her based on sex when she questioned Defendants' Chief Product Officer and its Chief Operating Officer about why she

had not been selected for and promoted to the Senior Vice President of Strategic Product Development position to lead the Biopharma business and advocated that she be selected for and promoted to the position, they understood and reasonably should have understood from the context that Ms. Shaya was complaining about unequal pay and unlawful discrimination against her on account of sex with respect to their refusal to promote her and her compensation.

102.   Plaintiff engaged in activity protected by the ELCRA when she questioned Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives about why she had not received any increase in her annual base salary, bonus or other incentive compensation, and equity awards while she performed Ms. DiSalvo's former duties and responsibilities and/or those of the former VP, Biopharma Development in addition to her own and advocated that she receive such increases.

103.   Although Ms. Shaya did not expressly accuse Defendants of unequal pay violations or discrimination against her based on sex when she questioned Defendants' Chief Product Officer, its Chief Operating Officer, and its human resources and other representatives about why she had not received any increase in her annual base salary, bonus or other incentive compensation, and equity awards while she performed Ms. DiSalvo's former duties and

responsibilities and/or those of the former VP Biopharma Development in addition to her own and advocated that she receive such increases, they understood and reasonably should have understood from the context that Ms. Shaya was complaining about unequal pay and unlawful discrimination against her on account of sex with respect to her compensation.

104.  Plaintiff engaged in activity protected by the ELCRA when she would not agree to terms and conditions of a proposed severance agreement and full and final release that were unacceptable to her, that were not indicative of mutuality, and that were not included in or anticipated by the Agreement.

105.  Plaintiff engaged in activity protected by the ELCRA when she initiated this action against Defendants for their violations of the ELCRA.

106.  Defendants' representatives retaliated against Plaintiff and interfered with her rights in violation of the ELCRA because of Plaintiff's opposition to their unequal pay practices and discrimination against her on account of sex with respect to promotion practices and her compensation, she refused to accept the terms of the proposed severance agreement and full and final release, and initiated this action when they:

   A. Refused to consider Plaintiff and only considered men for a vacant Senior Vice President of Strategic Product Development position for which she was more than qualified and the duties

and responsibilities of which she had been performing in addition to her own without additional base annual salary, bonus or incentive compensation, and equity awards for more than a year;

B. Failed to provide Plaintiff with base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work;

C.  Failed to provide Plaintiff with additional base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work after she assumed and performed the duties and responsibilities of the vacant Senior Vice President of Strategic Product Development position and those of the former VP Biopharma Development in addition to her own;

D. Failed to provide Plaintiff with base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what male vice presidents, her male peers, and males in lesser positions who received higher compensation from Defendants than Plaintiff received and are continuing to

receive;

E.  Terminated Plaintiff's employment to avoid paying her base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men received for equal, comparable, or less work;

F.  Refused to provide Plaintiff with alternative employment opportunities when her position allegedly was eliminated to prevent the full amount of her 2500 Class B Common Units of equity from vesting although men whose positions were eliminated were offered alternative employment opportunities;

G.  Filed the action entitled, *Signify Health, LLC, v. Amber Shaya*, Civil Action No. 3:21-cv-02945-B in the United States District Court, Northern District of Texas, Dallas Division; and

H.  Otherwise discriminated against and disparately treated Plaintiff on the basis of her sex with respect to compensation and other terms, conditions and privileges of her former Signify employment.

107.  As a direct and proximate result of Defendants' intentional violation of Plaintiff's civil rights as set forth in the ELCRA, Plaintiff has and will continue to suffer damages, including but not limited to: the loss of

employment; the loss of salary, bonus and incentive compensation, fringe benefits, stock or Unit awards and options, both past and future; humiliation, mortification, embarrassment, and shock; mental, emotional and physical pain, suffering, and distress; and damage to her personal and professional reputation.

## Count V
## Breach of Contract

108.  Plaintiff re-alleges and incorporates by reference the allegations stated in the preceding paragraphs as if reiterated paragraph by paragraph in this Count.

109.  As Defendants' VP, Product Management-Network Services and later as its VP, Operations, Ms. Shaya was employed by Defendants in accordance with the terms of an express or implied employment agreement which provided, among other terms, conditions, and benefits of Ms. Shaya's employment with Defendants, that her position was to have been a "permanent" position; her employment could not be terminated without good or just cause, which meant "due to reduction in force, downsizing, change in company direction, control or job elimination;" she would receive an annual base salary, a [s]igning bonus, and 2500 Class B Common Units of equity in

Defendants; she was eligible for additional bonus or incentive compensation, health, dental, disability, retirement and other benefits; and:

> "[i]n the event of an involuntary termination due to reduction in force, downsizing, change in company direction, control or job elimination you will be paid a severance in an amount equal to 9 months of your base salary. Severance is contingent upon execution of a Separation Release and Agreement."

110.   As Defendants' VP, Product Management-Network Services and later as its VP, Operations, Ms. Shaya was employed by Defendants in accordance with the terms of an express or implied employment agreement which provided and she legitimately expected that she would be treated the same as other vice presidents, her peers, and employees in lesser positions who received higher compensation from Defendants than Plaintiff with respect to annual base salary, bonus or other incentive compensation, and equity awards, opportunities and consideration for promotion, consideration for alternative employment opportunities, and other terms and conditions of employment.

111.   As Defendants' VP, Product Management-Network Services and later as its VP, Operations, Ms. Shaya was employed by Defendants in accordance with the terms of an express or implied employment agreement which provided and she legitimately expected that she would be treated the same as other vice presidents, her peers, and employees in lesser positions with

respect to alternative employment opportunities in the event her "permanent" job position was eliminated with or without cause.

112. During the period between October 29, 2018, and September 9, 2021, Defendants breached their employment agreement with Plaintiff when they:

A.  Failed to provide Plaintiff with base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men and women received for equal, comparable, or less work;

B.  Failed to provide Plaintiff with additional base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men and other women received for equal, comparable, or less work after she assumed and performed the duties and responsibilities of the vacant Senior Vice President of Strategic Product Development position and those of the former VP, Biopharma Development in addition to her own; and

C.  Failed to provide Plaintiff with base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what vice presidents, her peers, and employees in lesser positions who received higher compensation from

44

Defendants than Plaintiff received and are continuing to receive.

113.  Defendants breached their employment agreement with Plaintiff on September 9, 2021, when they:

A.  Terminated Plaintiff's employment because of her sex and opposition to Defendants' unequal pay practices and discriminatory promotion practices and to avoid paying her base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what vice presidents, her peers, and employees in lesser positions who received higher compensation from Defendants than Plaintiff received for equal, comparable, or less work; and

B.  Refused to provide Plaintiff with alternative employment opportunities when her position allegedly was eliminated to prevent the full amount of her 2500 Class B Common Units of equity from vesting although vice presidents, her peers, and employees in lesser positions whose positions were eliminated were offered alternative employment opportunities.

114.  Defendants have continued to breach their employment agreement with Plaintiff since September 9, 2021, by:

A. Refusing to provide Plaintiff with alternative employment opportunities since her position allegedly was eliminated to

prevent the full amount of her 2500 Class B Common Units of equity from vesting although vice presidents, her peers, and employees in lesser positions whose positions were eliminated were offered alternative employment opportunities; and

B. Refusing to tender a minimum of nine (9) months of severance pay equal to at least One Hundred Eighty-Seven Thousand Five Hundred Forty-Two and 42/100 ($187,542.42) to Plaintiff.

115. As a direct and proximate result of Defendants' breach of its express or implied employment agreement with Plaintiff, she has and will continue to suffer damages, including but not limited to: the loss of employment; the loss of salary, bonus and incentive compensation, fringe benefits, stock or Unit awards and options, both past and future; humiliation, mortification, embarrassment, and shock; mental, emotional and physical pain, suffering, and distress; and damage to her personal and professional reputation.

## VI.
## UNJUST ENRICHMENT

116. Plaintiff re-alleges and incorporates by reference the allegations stated in the preceding paragraphs as if reiterated paragraph by paragraph in this Count.

117.   As Defendants' VP, Product Management-Network Services and later as its VP, Operations, Plaintiff performed labor and services for Defendants in good faith and with the reasonable expectation that her position was to have been a "permanent" position; she would receive an annual base salary, a [s]igning bonus, and 2500 Class B Common Units of equity in Defendants; she was eligible for additional bonus or incentive compensation, health, dental, disability, retirement and other benefits; and:

> "[i]n the event of an involuntary termination due to reduction in force, downsizing, change in company direction, control or job elimination you will be paid a severance in an amount equal to 9 months of your base salary. Severance is contingent upon execution of a Separation Release and Agreement."

118.   As Defendants' VP, Product Management-Network Services and later as its VP, Operations, Plaintiff performed labor and services for Defendants in good faith and with the reasonable expectation that she would have been would be treated the same as vice presidents, her peers, and employees in lesser positions who received higher compensation from Defendants than Plaintiff with respect to annual base salary, bonus or other incentive compensation, and equity awards, opportunities and consideration for promotion, consideration for alternative employment opportunities, and other terms and conditions of employment.

119.   As Defendants' VP, Product Management-Network Services and later as its VP, Operations, Plaintiff performed labor and services for Defendants in good faith and with the reasonable expectation that she would have been would be treated the same as vice presidents, her peers, and employees in lesser positions with respect to alternative employment opportunities in the event her "permanent" job position was eliminated for cause or any or no reason.

120.   Defendants received the benefit of Plaintiff's services during the period between October 29, 2018, and September 9, 2021, but intentionally and deceptively refused and otherwise failed to pay Plaintiff the fair and reasonable value of those services and were unjustly enriched at Plaintiff's expense when they:

A.   Failed to provide Plaintiff with base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men and women received for equal, comparable, or less work;

B.   Failed to provide Plaintiff with additional base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what men and other women received for equal, comparable, or less work after she assumed and performed the duties and responsibilities of the vacant Senior Vice President of Strategic Product Development

position and those of the former VP Biopharma Development in addition to her own;

C.  Failed to provide Plaintiff with base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what vice presidents, her peers, and employees in lesser positions who received higher compensation from Defendants than Plaintiff received and are continuing to receive;

D.  Terminated Plaintiff's employment because of her sex and opposition to Defendants' unequal pay practices and discriminatory promotion practices and to avoid paying her base annual salary, bonus or incentive compensation, and equity awards comparable or equivalent to what vice presidents, her peers, and employees in lesser positions who received higher compensation from Defendants than Plaintiff received for equal, comparable, or less work;

E.  Refused to provide Plaintiff with alternative employment opportunities when her position allegedly was eliminated to prevent the full amount of her 2500 Class B Common Units of equity from vesting although vice presidents, her peers, and employees in lesser positions whose positions were eliminated were offered alternative employment opportunities; and

F.   Refused to tender a minimum of nine (9) months of severance pay equal to at least One Hundred Eighty-Seven Thousand Five Hundred Forty-Two and 42/100 ($187,542.42) to Plaintiff.

121.   As a direct and proximate result of Defendants' breach of their duties to Plaintiff and unjust enrichment of themselves, Plaintiff has and will continue to suffer damages, including but not limited to: the loss of employment; the loss of salary, bonus and incentive compensation, fringe benefits, stock or Unit awards and options, both past and future; humiliation, mortification, embarrassment, and shock; mental, emotional and physical pain, suffering, and distress; and damage to her personal and professional reputation.

**WHEREFORE,** Plaintiff requests that this Court enter an Order and Judgment against Defendants awarding to Plaintiff:

a.   Compensatory damages in an amount in excess of $75,000.00 to which she is found to be entitled, inclusive of back and front pay, bonus and incentive compensation, stock or Unit awards and options, and other compensation lost by Plaintiff due to discrimination and retaliation against her and other violations of her statutory, common law and contractual rights, and reimbursement for costs incurred by Plaintiff to replace lost benefits;

   b.       Liquidated damages for their violations of the Equal Pay Act of 1963;

   d.       Compensatory damages for mental anguish, emotional distress, humiliation and injury to her reputation;

   e.       Punitive and/or exemplary damages;

   f.       Reasonable attorney fees and costs, including expert witness fees, and pre and post judgment interest;

   g.       Injunctive or equitable relief to foreclose further violations of the ELCRA, EPA, and Michigan common law; and

   h.       Such other legal or equitable relief as this Court deems appropriate.

            Respectfully submitted,

            **GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN, P.C.**

            *__/s/ Raymond J. Carey__*
            **Raymond J. Carey (P33266)**
            Attorneys for Plaintiff
            30500 Northwestern Hwy., Ste. 425
            Farmington Hills, MI  48334
            (248) 865-0001
            rcarey@gmgmklaw.com

Date:  December 7, 2021

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff Amber Shaya, by her attorneys, GASIOREK, MORGAN, GRECO,

MCCAULEY & KOTZIAN P.C., demands a trial by Jury.

Respectfully submitted,

**GASIOREK, MORGAN, GRECO,
MCCAULEY & KOTZIAN, P.C.**

BY:   */s/ Raymond J. Carey*
         Raymond J. Carey (P33266)
         Attorney for Plaintiff
         30500 Northwestern Hwy, Ste. 425
Date: December 7, 2021         Farmington Hills, MI 48334
         (248) 865-0001
         rcarey@gmgmklaw.com